UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **DAVID NAKHID,** )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>**AMERICAN UNIVERSITY,** )<br>)<br>Defendant.  )<br>) | Case No. 19-cv-3268 (APM) |

**MEMORANDUM OPINION**

**I.     INTRODUCTION**

In the fall of 2018, Defendant American University's Athletic Department undertook a search for a new men's soccer coach. Plaintiff David Nakhid—who identifies as a Black man and is not a U.S. citizen—submitted his application from Lebanon, where he lived at the time, but he did not receive an interview. Defendant instead selected Zach Samol, a white man, to fill the role. Plaintiff alleges that the university failed to hire him because of his race, ethnicity, and national origin in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Defendant has moved for summary judgment, arguing that (1) Plaintiff's Title VII and section 1981 claims fail as a matter of law because these statutes do not reach him as a noncitizen applicant who was not present in the United States at the time of the relevant events, and (2) Plaintiff has not established evidence from which a reasonable jury could conclude that Defendant discriminated against him on the basis of race, ethnicity, or national origin in deciding not to hire him for the head coach position. For the reasons that follow, Defendant's motion for summary judgment is granted in full as to both claims.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     The Coaching Search

Defendant American University is a private university located in Washington, D.C. Def.'s Mot. for Summ. J., ECF No. 29 [hereinafter Def.'s Mot.], Statement of Undisputed Facts, ECF No. 29-2 [hereinafter Def.'s SOF], ¶ 1. Its men's soccer team competes at the National Collegiate Athletic Association ("NCAA") Division 1 level. *Id.* ¶¶ 2–3. In the fall of 2018, the Athletic Department, which oversees the men's soccer team, decided not to renew the employment contract of the team's then–head coach. *Id.* ¶ 8. Shortly after Thanksgiving, the Department made that decision public and initiated its search for a replacement, with the goal of filling the position by January 2019, just a few months later. *Id.* ¶¶ 9–10. At the helm of the hiring process was Andrew Smith, the Associate Athletic Director for Compliance and Internal Operations, who supervised the men's soccer team. *Id.* ¶¶ 6–7, 10. The remaining members of the committee to select the new hire were Dr. William Walker, the Athletic Director; Josephine Harrington, the Deputy Director of Athletics; and David Bierwirth, the Associate Director of Athletics for External Affairs. *Id.* ¶¶ 4, 20.

The process went as follows: Smith and the University's human resources department prepared to post, and eventually posted, the position on both internal and external websites. *Id.* ¶ 11. Amidst those preparations, members of the Athletic Department reached out to several potential candidates about the position, though they did not offer any of them the role before the official interviewing process began. *Id.* ¶¶ 14–17. Around 100 people applied to the position. *Id.* ¶ 18. Smith conducted an initial review of the applications. *Id.* ¶ 19. The members of the selection committee met to discuss which of the applicants would be selected for preliminary screening

interviews in early December, and they chose eight applicants.  *Id.* ¶¶ 20–21.  After conducting the eight initial screening interviews, members of the committee conducted follow-up interviews with five candidates via Skype.  *Id.* ¶ 23.  Next, the committee invited two of those five applicants, along with the then–assistant coach for the soccer team, to participate in an on-campus final-round interview involving various stakeholders in mid-December.  *Id.* ¶¶ 25, 32–33.   Finally, the committee met to discuss the finalists and ultimately decided to hire Zach Samol.  *Id.* ¶¶ 34–35.

Each of the applicants selected for the various interview stages—phone, Skype, and on campus—had previous collegiate coaching experience.  *Id.* ¶ 22.  Defendant asserts that this was not by coincidence: members of the selection committee uniformly testified that the "relevant experience" they sought in their job postings was collegiate coaching experience.  Def.'s Mot., Ex. 2, ECF No. 29-6 [hereinafter Smith Decl.], ¶¶ 9, 39; Def.'s Mot., Ex. 6, ECF No. 29-10 [hereinafter Smith Dep.], at 24–25; Def.'s Mot., Ex. 1, ECF No. 29-5 [hereinafter Walker Decl.], ¶ 14; Def.'s Mot., Ex. 8, ECF No. 29-12 [hereinafter Harrington Decl.], ¶ 7; Def.'s Mot., Ex. 9, ECF No. 29-13 [hereinafter Bierwirth Decl.], ¶ 6.  More specifically, they state that they sought collegiate coaching experience with a proven track record of success at a school like American:  a private postsecondary institution "with a good academic program."  Smith Decl. ¶ 11.

        2.     *Plaintiff Applies but Is Not Selected*

Plaintiff is one of the nearly 99 unsuccessful applicants for the coaching position.  He identifies as "Black or of the African diaspora."  Compl., ECF No. 1 [hereinafter Compl.], ¶ 7.  He learned of the open position and, on December 4, 2018, wrote to Dr. Walker and Smith to express his interest.  Def.'s SOF ¶ 37.  He was directed to the online application and completed it around December 12, 2018.  *Id.*  He was not selected for an initial screening interview or any subsequent interview.  *Id.* ¶ 41.

3

Plaintiff's career in and around soccer is extensive.  In the 1980s, he played on the American University men's soccer team and was, by all accounts, a standout player.  Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J., ECF No. 31 [hereinafter Pl.'s Opp'n], Pl.'s Statement of Material Facts [hereinafter Pl.'s SOMF], ¶ 2; Def.'s Reply in Supp. of Def.'s Mot. for Summ. J., ECF No. 32 [hereinafter Def.'s Reply], Def.'s Reply Statement of Undisputed Facts & Resp. to Pl.'s Statement of Material Facts, ECF No. 32-1 [hereinafter Def.'s Reply SOF], 19 ¶ 2.  After that, he played professionally, both in the United States and internationally, including on teams in Switzerland, Belgium, and Lebanon.  Pl.'s SOMF ¶ 3.  He also played on the national team for Trinidad and Tobago.  *Id.*  After retiring from professional play, he transitioned to coaching.  *Id.* ¶¶ 4–5.  He coached professional teams in Lebanon, was an assistant coach to a Trinidadian national team in the World Cup, and eventually established his own soccer academy, where he developed young players for professional and collegiate play.  *Id.*  But he has never worked as a coach for a collegiate soccer team in the United States.  Def.'s SOF ¶ 38.  When he applied for the head coach position at American, Plaintiff, a citizen of Trinidad and Tobago, was living and working in Lebanon.  *Id.*; Def.'s SOF ¶¶ 45–46 (citing Def.'s Mot., Ex. 16, ECF No. 29-20 [hereinafter Nakhid Dep.], at 8:18–9:5, 9:9–10:17).

**B.     Procedural Background**

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 26, 2019.  Compl. ¶ 5.  The EEOC issued a Notice of Rights to Plaintiff on August 2, 2019, after which he timely filed this action, bringing claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.  *Id.* ¶¶ 6, 22, 26.  Defendant moved to dismiss, arguing that Plaintiff had not alleged any facts rendering it plausible that discrimination motivated Defendant's failure to hire him.  Def.'s Mot. to Dismiss, ECF No. 7, at 1.  This court

4

denied that motion, holding that Plaintiff had "readily satisfie[d] the [Federal Rule of Civil Procedure] 8(a) standard." *Nakhid v. Am. Univ.*, No. 19-cv-03268 (APM), 2020 WL 1332000, at *1 (D.D.C. Mar. 23, 2020). After that, Defendant answered the Complaint. Answer to Compl., ECF No. 11. Following discovery, Defendant filed this motion for summary judgment.

### III.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" of a "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015).

In assessing a motion for summary judgment, the court looks at the facts in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). To defeat a motion for summary judgment, the nonmoving party must put forward "more than mere unsupported allegations or denials"; its opposition must be "supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial" and that a reasonable jury could find in its favor. *Elzeneiny*, 125 F. Supp. 3d at 28 (citing Fed. R. Civ. P. 56(e)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### IV.   DISCUSSION

#### A.   Section 1981 Claim

The court begins with Plaintiff's claim under 42 U.S.C. § 1981. Plaintiff alleges that Defendant failed to hire him based on his race, ethnicity, and national origin, thwarting his contract

opportunities and equal enjoyment of the rights, privileges, and benefits enjoyed by white citizens in violation of section 1981. Compl. ¶¶ 25–28. Defendant seeks judgment as a matter of law as to that claim on the ground that Plaintiff, an individual at all relevant times physically outside the United States, cannot avail himself of section 1981's protections. Def.'s Mot., Br. in Supp. of Def.'s Mot. for Summ. J., ECF No. 29-1 [hereinafter Def.'s Br.], at 6. A straightforward application of the statute's plain language resolves this question in favor of Defendant.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). By its terms, section 1981 does not protect those who are not "within the jurisdiction of the United States." *Id.* In the context of this statutory provision, being "within the jurisdiction of the United States" means being physically present within the United States. *See, e.g.*, *Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296, 303–04 (2d Cir. 2006) (concluding that the language of section 1981 "only protects persons within the United States' territorial jurisdiction"). Plaintiff was not physically present in the United States at any time relevant to the challenged employment action, *see* Nakhid Dep. at 8:18–9:5, 9:9–10:17, and so he cannot assert rights under the statute.

Plaintiff attempts to save his claim by arguing that "[j]urisdiction, within the meaning of the statute, actually means sufficient contacts with the United States so as to justify the application of its laws." Pl.'s Opp'n at 18. Plaintiff's reading of the statute erroneously conflates the concept of personal jurisdiction with section 1981's territorial jurisdiction. Because Plaintiff is not within section 1981's reach, the court grants Defendant's motion for summary judgment with respect to Plaintiff's section 1981 claim.

## B. Title VII Claim

### 1. *Whether Title VII Reaches Plaintiff*

The court next considers Plaintiff's Title VII claim. Plaintiff alleges that when Defendant failed to select him for the head coach position, it subjected him to discrimination based on his race and national origin in violation of Title VII of the Civil Rights Act of 1964. Compl. ¶¶ 21–24. As with Plaintiff's section 1981 claim, Defendant seeks judgment as a matter of law on this claim on the basis that Title VII does not reach him. Def.'s Mot. The court must decide whether Title VII applies to a noncitizen applying for employment in the United States when he is physically located outside the United States—that is, whether Plaintiff seeks an impermissible extraterritorial application of Title VII.[1] This question is not so straightforward.

"Courts presume that federal statutes 'apply only within the territorial jurisdiction of the United States.'" *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2136 (2018) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). The Supreme Court has articulated a "two-step framework for analyzing extraterritoriality issues." *RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2101 (2016). First, the court must "ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* The court "must ask this question regardless of

---

[1] The law in this Circuit is unclear whether the question of extraterritoriality is a matter of subject matter jurisdiction or a merits inquiry. *Baloun v. Tillerson*, No. 16-cv-0111 (KBJ), 2017 WL 6271267, at *1 n.2 (D.D.C. Mar. 30, 2017) ("The D.C. Circuit has not spoken directly to the question of whether a Title VII claim brought by an alien regarding oversees employment is *jurisdictionally* deficient[] . . . ."); *see also United States v. Miranda*, 780 F.3d 1185, 1191 (D.C. Cir. 2015) ("The extraterritorial reach of a statute ordinarily presents a merits question, not a jurisdictional question."); *Alipio v. Winter*, 631 F. Supp. 2d 29, 29 (D.D.C. 2009) (concluding that "an alien to whom Title VII does not apply" has "fail[ed] to state a claim upon which relief can be granted"). *But see Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 68 (D.D.C. 2002) (finding that "a permanent resident alien, who was employed extraterritorially," is "outside the scope of the protections of Title VII" and thus the court "lacks subject matter jurisdiction" over his Title VII claim), *aff'd*, 409 F.3d 414 (D.C. Cir. 2005). The court need not decide this issue for present purposes, as Defendant's motion is granted in full whether the extraterritoriality inquiry is a merits or subject matter jurisdiction question.

whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction." *Id.* If a statute does not apply extraterritorially, at the second step the court must "determine whether the case involves a domestic application of the statute, and [does] this by looking to the statute's 'focus.'" *Id.* "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *Id.* However, "if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*

In this case, the answer to the first inquiry—whether the presumption against extraterritoriality is rebutted—is plainly no. Nothing on the face of Title VII suggests that its substantive provisions and remedial scheme reach a noncitizen, nonresident applicant for domestic employment. The substantive provisions of Title VII make it "an unlawful employment practice for any employer . . . to fail or refuse to hire . . . any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The statute contains certain express provisions regarding its extraterritorial reach: it does "not apply to an employer with respect to the employment of aliens outside any State," 42 U.S.C. § 2000e-1(a), but it *does* apply to U.S. citizens employed abroad, 42 U.S.C. § 2000e(f). The former provision is known as the "alien-exemption clause," and Congress added the latter provision only after the Supreme Court, gleaning no "contrary intent" from the statute, held that Title VII did not apply extraterritorially to reach such individuals. *EEOC v. Arabian Am. Oil Co. (Aramco)*, 499 U.S. 244, 259 (1991). Congress thus plainly knew how to both limit and apply Title VII's territorial reach. It is therefore notable that the statute does not contain any explicit language extending its protections to noncitizens living abroad. *See id*. at 258 ("Congress' awareness of the need to make a clear

8

statement that a statute applies overseas is amply demonstrated by the numerous occasions on which it has expressly legislated the extraterritorial application of a statute.").

In *Aramco*, the Court held that "the statute's definitions of jurisdictional terms" and the alien-exemption clause, 42 U.S.C. § 2000e-1, without more, "fall[] short of demonstrating the affirmative congressional intent required to extend the protections of Title VII beyond our territorial borders."[2]  499 U.S. at 248–49; *contra* Pl.'s Opp'n at 15.  The same is true here. Although Congress later amended Title VII to expand its reach to U.S. citizens employed abroad by U.S. employers, *see* 42 U.S.C. § 2000e(f), the statute continues to contain no affirmative expression of extraterritorial application to those in Plaintiff's circumstances—a noncitizen, nonresident who applies for domestic employment from abroad.  Ultimately, "[t]he question is not whether [a court] think[s] 'Congress would have wanted' a statute to apply to foreign conduct 'if it had thought of the situation before the court,' but whether Congress has *affirmatively* and *unmistakably* instructed that the statute will do so."  *RJR Nabisco*, 136 S. Ct. at 2100 (emphasis added).  It did not here.  The court therefore must find that Title VII does not have extraterritorial application with respect to individuals in Plaintiff's position.  *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none.").

Having found that the statute does not rebut the presumption against extraterritoriality, the court proceeds to step two of the *RJR Nabisco* framework.  At this point, the court's task is to "determine whether the case involves a *domestic* application of the statute[] . . . by looking to the

---

[2] Plaintiff argues that "Defendant's reliance on [*Aramco*] is misplaced because . . . [it] was expressly overruled by legislative action," and that "[t]he subsequent amendment by Congress actually supports the view that Congress intended to broaden the scope and applicability of Title VII."  Pl.'s Opp'n at 16.  But Plaintiff fails to recognize that the Supreme Court has continued to cite *Aramco*, with approval, for its treatment of the presumption against extraterritoriality.  *E.g.*, *Bond v. United States*, 572 U.S. 844, 857 (2014); *Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020).  The court is unwilling to disregard *Aramco* as extant guiding precedent.

9

statute's 'focus.'" *RJR Nabisco*, 136 S. Ct. at 2101 (emphasis added). "The focus of a statute is 'the object of its solicitude,' which can include the conduct it 'seeks to regulate,' as well as the parties and interests it 'seeks to protect' or vindicate." *WesternGeco LLC*, 138 S. Ct. at 2137 (cleaned up) (quoting *Morrison*, 561 U.S. at 267). Once the court has determined the statute's focus, it measures the conduct underlying this action against that statutory focus. "If the conduct relevant to the statute's focus occurred . . . in a foreign country, then the case involves an impermissible extraterritorial application . . . ." *RJR Nabisco*, 136 S. Ct. at 2101.

*Aramco* provides a useful starting point for the focus inquiry in this case. In *Aramco*, the plaintiff had been hired in the United States, and he was a U.S. citizen, but the employment at issue was in Saudi Arabia. 499 U.S. at 247. The version of the statute under which the plaintiff brought his claim contained no express provision for extraterritorial application to U.S. citizens working abroad. The Court "concluded . . . that neither [the] territorial event [of hiring] nor [the citizenship] relationship was the 'focus' of congressional concern, but rather domestic employment." *Morrison*, 561 U.S. at 266 (citation omitted) (discussing *Aramco*); *see also Aramco*, 499 U.S. at 255 (noting that "elements in the statute suggest[] a purely domestic focus"). The employment practice the *Aramco* plaintiff challenged occurred while he was working for the defendant, 499 U.S. at 259, and so the "conduct relevant to the statute's focus," *RJR Nabisco*, 136 S. Ct. at 2101, was his employment in Saudi Arabia. Of course, Congress responded to *Aramco* by explicitly amending the statute to reach U.S. citizens employed abroad, and U.S. citizens employed abroad can now claim Title VII's protections. 42 U.S.C. §2000e(f). But the thrust of *Aramco* remains viable precedent.

Against that backdrop, the court turns to Plaintiff's assertion of Title VII's protections. Title VII confers a right not to be discriminated against in employment, and it effectuates that right

by prohibiting employer conduct that violates it.  The statute's substantive guarantees are aimed toward stamping out discriminatory employer conduct.  *See* 42 U.S.C. § 2000e-2 (proscribing discriminatory "employment practice[s]"); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973) ("The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens.").  But that does not mean that the "relevant conduct" for extraterritoriality purposes is necessarily the employer's allegedly discriminatory conduct.  As an illustration, in *RJR Nabisco*, the Supreme Court noted that it had previously "rejected [the] view" that "the presumption [against extraterritoriality] is primarily concerned with the question of what *conduct* falls within a statute's purview."  136 S. Ct. at 2106.  Accordingly, in that case the Court analyzed RICO's private right of action separately from its "substantive prohibitions."  *RJR Nabisco*, 136 S. Ct. at 2106.  It reached the conclusion that the former, unlike the latter, did not apply extraterritorially, reasoning that "[t]he creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not."  *Id.* (internal quotation marks omitted) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2001)).

    The D.C. Circuit took a similar approach in *Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904 (D.C. Cir. 2018), a case involving the Copyright Act.  There, the court framed the inquiry as "asking what components of an otherwise actionable statutory violation must occur within the United States to bring it within the Act's domestic sweep."  *Id.* at 914.  The court began by identifying "precisely what it is that the Act regulates," but it did not end there.  "[T]he Act grants copyright holders several 'exclusive rights' . . . and effectuates those rights by prohibiting 'infringement,' or the 'violat[ion] of those 'exclusive rights.'"  *Id.* (second alteration in original).

The court determined that "[t]he Copyright Act 'focuses[]' . . . on policing infringement or, put another way, on protecting the exclusivity of the rights it guarantees." *Id.* Critically, merely inquiring about whether and where substantively prohibited conduct occurred, as the defendant urged, was inadequate in terms of this focus—"[u]nder [defendant's] reading, a broadcaster would commit an infringing performance merely by transmitting a copyrighted work into the void, regardless of whether those transmissions ever result in the work's images being shown to even a single viewer." *Id.* at 915 (cleaned up). The court concluded that an actionable Copyright Act claim instead requires that the "infringing performances—and consequent violation of [the complainant's] copyrights—occur[] . . . in the United States." *Id.* at 914.

Thus, the focus of a statute "can include the conduct it 'seeks to regulate," but it can also include "the parties and interests it 'seeks to protect or vindicate.'" *WesternGeco,* 138 S. Ct. at 2137; *see also id.* ("When determining the focus of a [particular] statute, [courts] do not analyze the provision at issue in a vacuum. If the statutory provision at issue works in tandem with other provisions, it must be assessed in concert with those other provisions." (citation omitted)). Title VII is clear as to whose interests it seeks to protect or vindicate. It protects all employees working domestically for covered employers. 42 U.S.C. § 2000e(f); *see, e.g.*, *Iweala v. Operational Techs. Servs., Inc.*, 634 F. Supp. 2d 73, 80 (D.D.C. 2009). It now also provides relief for U.S. citizens working abroad for covered U.S. employers. *See* 42 U.S.C. § 2000e(f) ("With respect to employment in a foreign country, [the] term [employee] includes an individual who is a citizen of the United States."). But Title VII expressly excludes from its protections noncitizens working abroad for U.S. employers, *see id.* § 2000e-1(a), and exempts from its coverage "the foreign operations of an employer that is a foreign person not controlled by an American employer," *id.* § 2000e-1(c)(2). The scope of these protections makes clear that the private right of action in Title

12

VII is, at heart, concerned with "vindicat[ing] *domestic* interests." *WesternGeco*, 138 U.S. at 2138 (emphasis added); *see also Aramco*, 499 U.S. at 255 (emphasizing Title VII's "domestic focus"). That is, the statute's private right of action seeks to protect only the interests of U.S. citizens and U.S. residents. Its "focus" does not include the interests of a noncitizen, nonresident who submits his application from abroad. Here, Plaintiff applied for, and was not selected for, the head coach position while he was a citizen of Trinidad and Tobago living in Lebanon. Def.'s SOF ¶¶ 45–46. He therefore cannot assert a permissible domestic application of Title VII.

Holding otherwise would yield an incoherent interpretation of Title VII. The statute would protect foreign nationals who merely submit an application for a job in the United States from abroad even as it excludes foreign nationals who are actually employed by U.S. employers abroad. 42 U.S.C. § 2000e-1; *id.* § 2000e(f). Moreover, such a holding would effect a massive expansion of Title VII's protections. *Cf. Reyes-Gaona v. N.C. Growers Ass'n*, 250 F.3d 861, 866 (4th Cir. 2001) ("Expanding the ADEA to cover millions of foreign nationals who file an overseas application for U.S. employment could exponentially increase the number of suits filed and result in substantial litigation costs. If such a step is to be taken, it must be taken via a clear and unambiguous statement from Congress rather than by judicial fiat."). If Congress had thought that the statute reached discriminatory-hiring claims brought by noncitizen applicants outside the United States, it surely would have made that clear. *See id.* Because it has not, Plaintiff cannot avail himself of Title VII's protections. The court grants Defendant's motion with respect to Plaintiff's Title VII claim.

> 2. *Whether Plaintiff Has Offered Evidence from Which a Reasonable Jury Could Conclude that Defendant Discriminated Against Him*

Even if the court were to conclude Plaintiff had stated a cognizable claim under Title VII, Defendant raises multiple arguments why, if the court were to reach the merits, summary judgment

13

should be entered in its favor. The court agrees with one: on the record presented, no reasonable factfinder could find that Plaintiff was not hired for the head coach position on the basis of race, ethnicity, or national origin.[3]

At the outset, Defendant argues that Plaintiff cannot establish a prima facie case of discriminatory failure to hire for two reasons: (1) he is unqualified as a matter of law because he did not possess authorization to work in the United States at the time of his application, and (2) he is unqualified because he "lacked the requisite relevant experience." Def.'s Br. at 7–8. The court assumes without deciding that Plaintiff was in fact qualified for the head coach position and so can establish a prima facie case of discrimination on the basis of race, ethnicity, or national origin. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 n.1 (D.C. Cir. 2008) ("In a refusal-to-hire . . . discrimination case, the *McDonnell Douglas* prima facie factors are that: (i) the employee 'belongs to a racial minority' or other protected class; (ii) the employee 'applied and was qualified for a job for which the employer was seeking applicants'; (iii) despite the employee's qualifications, the employee 'was rejected'; and (iv) after the rejection, 'the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.'" (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802)).

The burden therefore shifts to Defendant to "articulate some legitimate, nondiscriminatory reason" for failing to hire Plaintiff. *McDonnell Douglas Corp.*, 411 U.S. at 802. At the summary judgment stage, "once the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture." *Brady*, 520 F.3d at 493 (cleaned up). Rather, the "central

---

[3] The same analysis applies to Plaintiff's section 1981 claim, if he can raise it. *See Ladson v. George Wash. Univ.*, 204 F. Supp. 3d 56, 62–63 (D.D.C. 2016) ("The legal standards applicable to [plaintiff's Title VII and section 1981] claims are the same . . . .").

question" becomes: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* at 494.

Defendant has come forward with a legitimate, nondiscriminatory reason for failing to hire Plaintiff. It asserts that "he was not qualified for the Position" because "he had no experience coaching for any college or university." Def.'s Br. at 8–9 (emphasis omitted). Defendant argues that Plaintiff cannot meet his burden of showing that Defendant's stated reason for failing to hire him was "a pretext." *Brady*, 520 F.3d at 495. Plaintiff's case of pretext can be distilled as follows: (1) the head coach job description and job posting do not support Defendant's stated reason, and this disjunction shows pretext, Pl.'s Opp'n at 23–24; (2) his qualifications were "far superior" to those of the ultimate selectee for the head coach role, showing discrimination was the reason for Defendant's decision, *id.* at 24–25; and (3) Defendant's "circumvention" of its internal affirmative action and recruiting policies and the all-white composition of its Athletic Department leadership "evince discrimination," *id.* at 25. The court will discuss each of these three arguments in turn.

First, while the job descriptions posted online for the head coach position can reasonably be read not to strictly require collegiate coaching experience, that is not enough to establish pretext. As Plaintiff notes, the two job descriptions do not contain an explicit requirement of collegiate coaching experience. Pl.'s Opp'n at 23; *see also* Def.'s Mot., Ex. 3, ECF No. 29-7 (requiring "5–8 years of relevant experience," "[d]emonstrated knowledge and success in coaching at the collegiate *or* professional level," "[t]he *ability* to work within NCAA and Patriot League regulations," and "[t]he *ability* to work successfully with male college student-athletes" (emphasis added)); Def.'s Mot., Ex. 4, ECF No. 29-8 (similar). Indeed, the court is skeptical that the job

15

descriptions themselves automatically disqualified any applicant who, for instance, possessed significant professional coaching experience but no college experience. *See Nakhid v. Am. Univ.*, No. 19-cv-03268 (APM), 2020 WL 1332000, at *1 (Mar. 23, 2020) (finding that "the job posting did not require actual [collegiate coaching] experience").[4]

The salient point for pretext, however, is not whether the asserted nondiscriminatory reason is accurate but whether it is sincerely held. *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("The issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reason it offers." (cleaned up)); *see also Brady*, 520 F.3d at 494 (plaintiff must show employer's asserted reason "was not the *actual* reason" (emphasis added)). There is no factual dispute that the decisionmakers involved in the hiring process understood the position to be one that required collegiate coaching experience and that they made their decisions with an eye toward that criteria. Smith Decl. ¶¶ 9, 11, 39; Smith Dep. at 24–25; Walker Decl. ¶ 14; Harrington Decl. ¶ 7; Bierwirth Decl. ¶ 6. That honest belief is corroborated by the undisputed fact that all eight candidates selected for a screening interview, two of whom were Black Americans, "had significant experience coaching collegiate soccer." Def.'s SOF ¶ 22. Plaintiff has offered no evidence refuting that Smith—who was responsible for the initial review of applicants—or the other members of the selection committee honestly held the belief that prior collegiate coaching experience was a job requirement.

Plaintiff cites two unreported, out-of-Circuit district court opinions in support of his argument that "[d]iversion from the requirements in a job posting or description creates a genuine issue of fact as to qualification and is sufficient evidence from which to deny summary judgment." Pl.'s Opp'n at 23. But these cases do not stand for that proposition. First, the portion of

---

[4] The court doubts that if Pep Guardiola or Zinedine Zidane had applied for the head coach position he would have been deemed not qualified because of a lack of U.S. collegiate coaching experience.

16

*Eichelberger v. Champion Aerospace, Inc.*, No. 8:08-2990, 2010 WL 97770 (D.S.C. Jan. 11, 2010), that Plaintiff cites concerns qualification in the context of the prima facie case, not pretext. Pl.'s Opp'n at 23 (citing *Eichelberger*, 2010 WL 97770, at *6). The defendant's diversion from the job description in that case sufficed to establish an issue of material fact as to the plaintiff's qualification only as an element of his prima facie case of discrimination. *Eichelberger*, 2010 WL 97770, at *6. It did not factor significantly into the pretext analysis. *Id.* at *7–8 (emphasizing that the job posting was "a source of substantial confusion and misdirection" in large part because the job posting was removed after plaintiff was rejected and then reposted under a different job title). Here, the court has assumed that Plaintiff was qualified for the head coach role for purposes of establishing a prima facie case of discriminatory failure to hire, and the other "suspicious" "irregularities" that led the court in *Eichelberger* to find that pretext posed a jury question do not appear here. *See id.*

In the second case Plaintiff cites, *Ziegler v. Steelton-Highspire School System*, the defendant's diversion from its job posting created a jury question on pretext because the alleged job qualification at issue, "computer proficiency," was not "an inherently obvious requirement for the position, which involve[d] primarily the handling of student disciplinary issues." No. 1:04-cv-0788, 2005 WL 2030440, at *1 (M.D. Pa. Aug. 3, 2005). "Indeed, the other applicants for the job were not even asked about their computer skills during the interview process." *Id.* That was certainly not the case here, where even if not explicitly listed in the job description, collegiate coaching experience is reasonably related to the head coach position, and where every applicant for the head coach position that was selected for an interview did in fact have "significant experience coaching collegiate soccer." Smith Decl. ¶ 20. Plaintiff's argument about the disconnect between the qualifications listed in the job postings and Defendant's stated reason for

17

not selecting him is therefore unavailing; this disconnect, without more, is insufficient to create a jury question on pretext.

Next, Plaintiff has not established the requisite "wide and inexplicable gulf," *Lathram v. Snow*, 336 F.3d 1085, 1091 (D.C. Cir. 2003), in qualifications between him and Zach Samol (the successful job applicant) to establish pretext. Plaintiffs in failure-to-hire cases can demonstrate pretext by comparing their own qualifications with those of the successful applicant. *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) ("If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture."). But cases in this Circuit make clear that a plaintiff must be "substantially," "significantly," and "markedly more qualified" than the selectee to raise an inference of pretext. *Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012). For example, one prevailing plaintiff, who was not selected for a pharmacy technician position, had nineteen years of experience as a hospital assistant and both bachelor's and master's degrees, while the successful applicant's work experience amounted to one year in the hospital laundry and two months as a pharmacy volunteer, and he had no college education. *Aka*, 156 F.3d at 1295–97.

Here, the relative qualifications are not so glaringly disparate. Both Plaintiff and Samol possessed a form of professional licensure—while Samol's was, in Plaintiff's account, lower than Plaintiff's, it was one of the certifications explicitly sought in the job description. Smith Decl. ¶ 36; Pl.'s SOMF ¶ 20. Samol and Plaintiff alike had both collegiate and professional playing experience. Def.'s Mot., Ex. 10, ECF No. 29-14 [hereinafter Samol Resume], at 3; Pl.'s SOMF

18

¶¶ 2–3. Plaintiff had, according to his resume, ten years of coaching experience, with both professional teams and his youth soccer academy, Def.'s Mot., Ex. 15, ECF No. 29-19, at 3; Samol had eighteen years of collegiate coaching experience at institutions of a similar profile to American University (Georgetown, Yale, and Boston College), Samol Resume at 2–3. Any "qualifications gap" that may exist is simply not "great enough to be inherently indicative of discrimination." *Hamilton*, 666 F.3d at 1352 (internal quotation marks omitted).

Finally, the circumstantial evidence regarding Defendant's affirmative action hiring program and the demographics of its staff do not raise an inference of discrimination sufficient to carry Plaintiff's burden at summary judgment. Plaintiff argues that "the hiring manager and committee's purposeful circumvention" of the affirmative action policy raises an inference of discriminatory intent. Pl.'s Opp'n at 25. The court assumes for present purposes that an employer's violation of its own affirmative action policy could possibly give rise to an inference of pretext. *See Gonzales v. Police Dep't*, 901 F.2d 758, 761 (9th Cir. 1990) ("[E]vidence that the employer violated its own affirmative action plan may be relevant to the question of discriminatory intent."). But Plaintiff has not established a violation here. The only evidence he offers of a purported deviation from the affirmative action policy is the absence of a close-out form that hiring managers are meant to sign at the end of the recruitment process; that form "includ[es] a certification that the hiring manager complied with American's Affirmative Action and anti-discrimination policies throughout the process." Pl.'s SOMF ¶¶ 8, 15. Plaintiff has not offered any evidence that the mere failure to submit a close-out form constitutes a violation of the university's affirmative action policy—certainly, no witness so testified. *See* Def.'s Reply SOF ¶ 42. Moreover, the evidence of what did occur in the hiring process undercuts Plaintiff's argument that the affirmative action policy was flouted to avoid consideration of Black candidates:

19

two of the eight candidates selected for a screening interview were Black, and one of those two was selected for a follow-up interview. Smith Decl. ¶ 28; Def.'s SOF ¶¶ 22–23.

Plaintiff also points to the demographic make-up of Defendant's coaching staff. Pl.'s Opp'n at 25. If in some cases an all-white coaching staff might give rise to an inference of pretext, it does not do so in this case without more. For instance, there has been no evidence on the length of coaches' and Athletic Department members' tenures, who was involved as decisionmakers in their hiring, and whether any Black applicants were in the candidate pool for those positions. Absent such evidence, a reasonable trier of fact could only speculate that race, national origin, or ethnicity played a role in the decision not to interview or hire Plaintiff.

In sum, none of Plaintiff's theories for pretext succeed in rebutting Defendant's legitimate, nondiscriminatory reason for failing to hire Plaintiff, and so—even if Plaintiff can avail himself of Title VII's protections—he has not established sufficient facts from which a reasonable jury could conclude that Defendant discriminated against him on the basis of race, ethnicity, or national origin.

## V. CONCLUSION

For the foregoing reasons, the court grants Defendant's motion for summary judgment in full as to all claims.

A final, appealable Order accompanies this Memorandum Opinion.

Dated: September 14, 2021

Amit P. Mehta
United States District Court Judge